**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MIKHAIL KOGAN** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **T-M AUTOMOTIVE, INC. d/b/a TEAM** | **NO.  22-0519** |
| **TOYOTA,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Mikhail Kogan brings this action against his former employer, T-M Automotive, Inc.

doing business as Team Toyota ("Team Toyota"), arguing Team Toyota terminated him because

of his disability, cancer.  Kogan brings claims under both the Americans with Disabilities Act

("ADA") and Pennsylvania Human Relations Act ("PHRA").  Team Toyota has moved for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow,

the Motion for Summary Judgment will be denied.

### I.    BACKGROUND

Mikhail Kogan began working with Defendant Team Toyota, a new and used car

dealership, as a sales employee in 2011.  Approximately two years later Team Toyota offered,

and Kogan accepted, an additional role at the dealership as lease coordinator.  Kogan became the

sole sales representative responsible for this role unless he was absent from work.  Kogan

received compensation for acting as lease coordinator separate from and in addition to

compensation from his sales position.  He maintained both roles until he was furloughed from

the dealership in spring 2020.  Over the nine years Kogan worked for Team Toyota he received

three disciplinary warnings for low car sales in 2014, 2018, and 2019, respectively.  The 2014

1

warning was issued because Kogan sold nine rather than ten cars per month in a three-month period. Kogan was not terminated after any of these warnings.

In March 2018, Kogan was diagnosed with Stage IV renal cancer and began chemotherapy. He lost weight and, among other effects from his disease and treatment, needed an accommodation at work: to sit down from time to time. Team Toyota accommodated this request. Starting in January 2019 Kogan took two months of medical leave for treatment of a chemotherapy complication. When he returned in March 2019, Kogan needed occasional time off to attend doctor appointments and medical treatments, which Team Toyota approved. Kogan experienced (though it is disputed whether others from Team Toyota noticed) changes to his physical appearance and fatigue as a result of his cancer and treatment.

In March 2020, the COVID-19 pandemic disrupted Team Toyota's business causing it to furlough all sales employees. Kogan received an initial furlough notice in which Team Toyota did not provide a date when employees could expect to return to work but was hopeful and optimistic that all employees would, eventually, be recalled. Team Toyota sent Kogan a second letter on April 30, 2020 stating that his furlough would continue through May, but it hoped to restore Kogan to his position on June 1, 2020. Team Toyota did not reach out to Kogan on or after June 1. In September 2020, Kogan spoke with fellow sales employees Mazin Hamad and/or Marc Goldberg at a lunch. He learned from them, for the first time, that Team Toyota had recalled other sales employees in or around late May or early June 2020. Team Toyota did indeed first recall sales employees Jason Woldorf and Matthew McDonald followed thereafter by Frank Marte, Thomas Mellon, Mazin Hamad, Jeffery Madison, Kevin Lee Vanvorst, Daniel Vasile Formagiu, Anthony Hinds, Basem Hamad, Richard Rogers,[1] Jonathan Alberto Lopez,

---

[1] It is not entirely clear when Rogers was recalled and at what point he was transferred to another dealership. Team

Christian Edwin Colon, Frank Dea, and Dekia Jones.  Unbeknownst to Kogan, Team Toyota terminated him on June 15, 2020.  Christian Erxleben, general sales manager at Team Toyota, made recall and termination decisions based on four sales statistics categories: total vehicles sold, front-end gross profit average, back-end gross profit average, and total products per deal sold throughout 2019 and in the first quarter of 2020.

On October 5, 2020 Kogan called Erxleben.  Kogan asked after Erxleben and inquired about business at the dealership.  Erxleben responded by either asking Kogan how he was doing or about his cancer.[2]  Kogan explained he was feeling well and asked about returning to work, but Erxleben informed Kogan he had been terminated.  This was the first time Kogan heard of his termination.  Erxleben's reasoning for Kogan's termination on this call was either because Team Toyota did not believe Kogan could perform in his job or based on Kogan's low sales statistics.[3]  Kogan filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Team Toyota in December 2020.  Following the EEOC's notice of dismissal, Kogan filed the present lawsuit.

## II.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment will be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (internal

---

Toyota acknowledges that Rogers was recalled, but confusingly also states he was transferred to another dealership prior to the COVID-19 pandemic.  Rogers is listed in the quarter one 2020 sales statistics that were used to make the recall and termination decisions.  He was presumably at the dealership as a salesperson for at least part of that time.  For the purposes of summary judgment, where the facts are viewed in the light most favorable to Kogan, Rogers will be evaluated as a Team Toyota sales employee who was recalled for the purposes of comparison to Kogan, as Team Toyota states, but was at some point transferred to a different dealership.

[2] This fact is disputed and is further explored *infra*.

[3] This fact is disputed and is further explored *infra*.

quotations omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48; *see also Doe v. Abington Friends Sch*., 480 F.3d 252, 256 (3d Cir. 2007). "Facts that could affect the outcome are 'material facts,' and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (relying on *Anderson*, 477 U.S. at 248). "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III.   DISCUSSION

To present a *prima facie* disability discrimination case under the ADA, 42 U.S.C. § 2102 (1990), a plaintiff must demonstrate that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and[,] (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998).[4]   Team Toyota does not contest that Kogan has a disability or that he is otherwise

---

[4] "The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835-36 (3d Cir. 2015) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir.2002)); *see also Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 n.5 (3d Cir. 2011). One significant challenge in this conjoined analysis is that Congress broadened the definition of disability in 2008 amendments to the ADA and the PHRA has not been similarly amended. *See Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015); *see also Ostrowski v. Con-Way Freight, Inc.*, 543 F. App'x 128, 131 (3d Cir. 2013) (citing 42 U.S.C. § 12102(4)(A), the Third Circuit determined that through "these amendments, Congress directed courts to interpret the term 'disability' broadly 'to the maximum extent permitted by the terms of this chapter.'"). Whether Kogan had a qualifying disability is not at issue in this case. Even if it were, his cancer would still qualify as a disability under the PHRA, as is addressed *infra*. As such, Kogan's claims are evaluated through the ADA but the analysis also applies to the PHRA.

qualified but argues Kogan did not suffer an adverse employment action because of his disability.

### A. Disability

Kogan satisfies the first requirement of the ADA, that he has a disability under the statute. *Gaul*, 134 F.3d at 580. An individual with disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or[,] (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). Under the first category, "the [ADA implementing] regulations explain that '[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 257 (3d Cir. 2020) (citing 28 C.F.R. § 36.105(d)(1)(v)).

Cancer can be one such disability. "[A] major life activity also includes the operation of a major bodily function, including but not limited to . . . normal cell growth[.]" 42 U.S.C. § 12102(2)(B) (1990). "There can be little doubt that a medical condition as serious as cancer may substantially limit major life activities." *Showers v. Endoscopy Ctr. of Cent. Pa., LLC*, 58 F. Supp.3d 446, 461 (M.D. Pa. 2014); *see also Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009) ("Eshelman was, unquestionably, substantially impaired in the major life activity of working during her six-month absence for cancer treatment[.]"); *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 172 (3d Cir. 2017) (non-precedential) ("We agree that cancer can—and generally will—be a qualifying disability under the ADA."); *Huyett v. Doug's Fam. Pharmacy*, 160 A.3d 221, 223 (Pa. Super. 2017) (upholding a lower Pennsylvania court's finding that cancer qualified as a disability under the PHRA). "In fact, the [ADA amendments in 2008 were] adopted to specifically address certain impairments that were not receiving the protection that

5

Congress intended—cancer, HIV-AIDS, epilepsy, diabetes, [among other conditions.]"  *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp.2d 502, 513 (E.D. Pa. 2012).  Here, there is no doubt Kogan was diagnosed with and suffered from cancer as well as various side effects from his cancer treatment which significantly limit his major life activities when compared to the general population.  He also experienced (though it is disputed whether Erxleben noticed) changes to his physical appearance and fatigue as a result of his cancer and treatment.  As such, he has a qualifying disability under the ADA.

Team Toyota, while conceding that Kogan has a disability, contends, confusingly, that Kogan was not regarded as disabled and therefore does not have a *prima facie* case under the ADA.  The statute, however, only requires plaintiffs to establish one of the three aspects of disability: 1) an impairment that substantially limits a major life activity, 2) a record of that impairment, *or* 3) show they were regarded as having an impairment.  42 U.S.C. § 12102(1).  Thus, because Kogan has demonstrated he has a disability, he need not show Team Toyota regarded him as having such an impairment.  Accordingly, Kogan has established he had a disability under the ADA.

### B.  Otherwise Qualified

Kogan also meets the second ADA requirement in that he is an otherwise qualified individual under the statute.  *Gaul*, 134 F.3d at 580.  "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."  29 C.F.R. § 1630.2(m); *see also Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 145-46 (3d Cir. 1998).  Here, Kogan worked at Team Toyota's car dealership for approximately nine

years, for seven of those years acting as both a sales employee and a lease coordinator.  Kogan

performed his job even after he was diagnosed with cancer, while underwent chemotherapy, and

when undergoing other related medical treatments.  Despite three disciplinary warnings over the

years, Team Toyota does not dispute that Kogan was able to continue performing the essential

functions of his position.  As such, Kogan was otherwise qualified.

### C.  Adverse Employment Action Because of Disability

The key issue in this case is whether Kogan's termination was due to his disability.  *Gaul*,

134 F.3d at 580.  "Under the *McDonnell Douglas* burden shifting paradigm" a plaintiff has the

"initial burden" to set out their *prima facie* case for disability discrimination under the ADA,

otherwise referred to as a causal link or nexus between the adverse employment action and the

plaintiff's disability.  *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 793-94 (1973) (hereafter "*McDonnell Douglas*"));

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997).

> [I]f s/he does so, the burden shifts to the employer to articulate
> some legitimate, nondiscriminatory reason for the employment
> action.  If the defendant meets this burden, the presumption of
> discriminatory action raised by the *prima facie* case is rebutted.
> However, the plaintiff must then be afforded an opportunity to
> show that the employer's stated reason for the employment action,
> such as plaintiff's rejection or separation, was pretextual.

*Wishkin*, 476 F.3d at 185 (citing *McDonnell Douglas*, 411 U.S. at 802 & 804 and *Tex. Dep't. of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  "We are not unmindful of the difficult

task a plaintiff faces in proving discrimination in the application of subjective factors.  It arises

from an inherent tension between the goal of all discrimination law and our society's

commitment to free decisionmaking by the private sector in economic affairs."  *Ezold v. Wolf,*

*Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992).

### i.   *Causal Link or Nexus*

Kogan must first establish a causal link or nexus between his termination and his disability.  *See e.g.*, *Krouse*, 126 F.3d at 504); *see also e.g.*, *Drummer v. Trustees of Univ. of Pa.*, 286 F. Supp.3d 674, 683 (E.D. Pa. 2017).  "Although [the plaintiff] need not establish [a] precise kind of disparate treatment to establish a claim of discrimination, he must establish some causal nexus between his membership in a protected class and the decision to [terminate] him." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

Kogan argues a reasonable jury could find he was terminated because of his disability based, in part, on his October conversation with Christian Erxleben, Team Toyota's general sales manager and the employee responsible for the dealership's recall and terminations decisions. Kogan recalls Erxleben asked him "how is your cancer?" before informing Kogan that he had been terminated because Team Toyota believed Kogan could no longer adequately perform his job.  Kogan argues Erxleben's question focusing in on his cancer reflects a wider-ranging perception which existed at the time of his termination in June 2020 that he could no longer adequately perform his job because of his disability.  Kogan recalls that right after asking about his cancer, Erxleben informed Kogan that Team Toyota did not believe he could perform the job he had been adequately performing for nine years.  As such, there is arguably a causal link between his disability and Team Toyota's decision to terminate him.[5]

Team Toyota attempts to rebuke Kogan's causal nexus argument by arguing that Erxleben was asking Kogan how he was doing generally without regard to his cancer and by also

---

[5] Team Toyota disagrees, arguing that there is no causal nexus because Kogan changed his story about Erxleben's question.  Team Toyota points to the Complaint where Kogan's alleges Erxleben asked him "how are you feeling?" as compared to statements in Kogan's deposition and summary judgment pleadings where he now recalls Erxleben asking "how is your cancer?"  But, "part[ies] cannot rest on the allegations contained in [the] complaint in opposition to a properly supported summary judgment motion[.]"  *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

framing Erxleben's statements in the October 2020 phone call as an off-handed comment temporally independent from the termination decision.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold*, 983 F.2d at 545.  Notably though, this does not preclude consideration of such statements, particularly on summary judgment when the record is viewed, and inferences are made, in the light most favorable to the non-moving party. *Diebold, Inc.*, 369 U.S. at 655 (1962).  When Erxleben spoke with Kogan in October 2020, assuming in the light most favorable to Kogan that Erxleben asked about Kogan's cancer, his question was more than three months after Team Toyota made the termination decision.  Yet, "'the mere passage of time is not legally conclusive proof'" that there is no causal nexus.  *Krouse*, 126 F.3d at 503 (quoting *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 894 (3d Cir. 1993)).  Kogan argues not just that Erxleben's question was indicative of discrimination during the call, but also implies a wider ranging discrimination underlying Team Toyota's decision to terminate him.  There is at minimum a genuine dispute of material fact as to whether Erxleben asked Kogan about his cancer, how he was feeling, or just generally asked how Kogan was doing.

Kogan further argues a causal nexus exists because Team Toyota recalled several sales employees with worse sales metrics than his.   As he performed similarly or better than some who were recalled, Kogan argues his termination was not based on his production numbers but rather because of his disability.  Team Toyota considered four measures in making its recall and termination decisions: total vehicles sold, front end gross profits, back end gross profits, and total products sold per deal.  In 2019, four sales employees (Jonathan Lopez, Christian Colon, Frank Dea, and Dekia Jones) all sold fewer cars than Kogan.  Dea, Jones, and Richard Rodgers all had

greater front end gross profit value losses than Kogan in 2019.  Kogan's 2020 numbers were

even better.  He sold more total vehicles in 2020 than Fabian and Rodgers, though Team Toyota

states Fabian only worked one out of the three months of the first quarter of 2020 (and it cannot

be discerned from the record whether Fabian was recalled).  Kogan's front end gross profit in the

first quarter of 2020 was higher than nine of his colleagues (Basem Hamad, Mellon, Elton,

Jones, Lopez, Woldorf, Madison, Goldberg, and Rodgers) and all were recalled except Elton (for

reasons independent of his sales statistics).  Kogan also performed better in his 2020 back end

gross profit than Rodgers.  Finally, Kogan sold more total products per deal in 2020 than either

Rodgers or Fabian.  As such, Kogan argues considering both 2019 and 2020 numbers, his

performance was better than others who were recalled.

These disputes as to the content of the phone call and the strength of Kogan's sales

numbers alone raise a genuine issues of disputed material fact as to whether there was a causal

link between Kogan's disability and his termination.

## ii.    *Legitimate, Non-Discriminatory Reason*

The burden now shifts to Team Toyota "to articulate some legitimate, nondiscriminatory

reason" for Kogan's termination.  *Wishkin*, 476 F.3d at 185 (citing *McDonnell Douglas*, 411 U.S.

at 802).  Team Toyota's first and primary argument is that it recalled only its strongest sales

employees following the financial constraints of the COVID-19 pandemic.  Kogan, it posits, was

not one of those employees.  It highlights what it frames as Kogan's poor performance.  Kogan,

Team Toyota argues, had the worst sales statistics in two 2019 categories: back end gross profit

and total products sold per deal.  Team Toyota also attempts to contextualize the 2019 categories

where Kogan outperformed Lopez, Colon, Dea, and Jones.  Those four were newly hired and

only worked for the dealership in the last two to four months of 2019 as compared to Kogan's

ten months.  Team Toyota argues that in the aggregate Kogan had the worst record of any sales

employee in 2019.  As such, Team Toyota argues it had a legitimate, non-discriminatory reason

to terminate Kogan.

Second, Team Toyota argues its recall of another sales employee with cancer

demonstrates that Team Toyota did not discriminate against Kogan because of his disability.

Another sales employee, Goldberg, was diagnosed with cancer in 2019 and missed two months

of work due to cancer surgery and treatments.  Goldberg, unlike Kogan, was recalled back to the

dealership in 2020.[6]  Team Toyota argues it recalled Goldberg and not Kogan based exclusively

on their sale metrics, reasoning that it could not have discriminated against Kogan because it

treated similarly situated employees similarly, *i.e.*, made recall determinations based on their sale

statistics alone, not their disabilities.  Taken together, Team Toyota's reasons thereby rebut

Kogan's causal nexus arguments.

### iii.    Pretext

In response, Kogan must "be afforded an opportunity to show that [Team Toyota's]

stated reason for the [termination] . . . was pretextual."  *Wishkin*, 476 F.3d at 185 (citing

*McDonnell Douglas*, 411 U.S. at 804).

> [T]he plaintiff generally must submit evidence which: 1) casts
> sufficient doubt upon each of the legitimate reasons proffered by
> the defendant so that a factfinder could reasonably conclude that
> each reason was a fabrication; or 2) allows the factfinder to infer
> that discrimination was more likely than not a motivating or
> determinative cause of the adverse employment action.

*Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994); *see also Ezold*, 983 F.2d at 523 (quoting

---

[6] Though Team Toyota recalled Goldberg, he chose not to return to work due to concerns about the dealership's
COVID-19 precautions.  The key point, Team Toyota argues, is that it chose to recall Goldberg and offer him the
opportunity to return to work based on his sales statistics.

*Burdine*, 450 U.S. at 256).

On summary judgment, a plaintiff can "discredit[] the proffered reasons, either circumstantially or directly[.]" *Fuentes*, 32 F.3d at 764.  Plaintiffs "must [do so by] demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Id.* at 765 (quoting *Ezold*, 983 F.2d at 539 & *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).  "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*.

Kogan raises three arguments to demonstrate Team Toyota's reasons are pretextual. First, Kogan posits that Team Toyota incorrectly categorizes his sales statistics and that other recalled sales employees had worse sales statistics than Kogan.  In doing so, Kogan points to inconsistency, incoherence, and contradiction in Team Toyota's arguments from which a reasonable jury could find Team Toyota's reason for terminating Kogan fabricated.  Kogan performed better than others in two 2019 categories: total vehicles sold and front-end gross profits.  In the latter, Kogan performed better than Rogers who worked for all of 2019.  Kogan argues that Team Toyota did not consider tenure or seniority in making recall and termination decisions, and as such the raw numbers of his 2019 sales statistics should not be discounted even in light of the fairly short tenures of Lopez, Colon, Dea, and Jones.  Even viewed from that perspective, Kogan still performed better than Rogers who worked for all of 2019, rather than

Kogan's ten months.  In 2020, Kogan performed better than fellow sales employees in every category, notably better than nine others in the front-end gross profit category, all of whom were recalled except Elton.  The evidence shows that there is a genuine dispute of material fact as to Kogan's overall performance viz-a-viz Team Toyota's other sales' people in 2019 and 2020 from which a reasonable jury could find that Team Toyota's reason for terminating Kogan is pretextual.

Second, Kogan argues his sales statistics are lower than they would be otherwise because his time at work was divided between his roles in sales and as lease coordinator.  Kogan estimates he spent a significant portion of his time devoted to the lease coordinator position, somewhere between forty and fifty percent of his monthly working time.  Erxleben knew Kogan filled more than one role at the dealership and was the only sales employee in the lease coordinator position, but nevertheless lumped Kogan in with all other sales employees who did not have this extra responsibility.  And none of Kogan's work in this extra responsibility was included in the statistics Team Toyota states it relied on to make recall determinations.  Team Toyota disagrees that Kogan spent a significant portion of his time in the lease coordinator role. It argues that his responsibilities under the role were minimal and would not have affected, for instance, his ability to make sales on the most productive days for car sales at the dealership. Team Toyota further argues, while aspects of the lease coordinator role did not directly contribute to Kogan's sale statistics, the role provided him with additional opportunities to make sales to lease customers.  Given these contrary positions, there is a genuine dispute of material fact on the amount of time Kogan spent in his lease coordinator role.

Third, Kogan argues Team Toyota's reliance on Goldberg's recall has limited impact on whether he was fired because of his disability.  Kogan notes that many details of Goldberg's

cancer diagnosis and treatment are unknown including when he was undergoing treatment, the type or severity of Goldberg's cancer, and how comparable his cancer was to Kogan's cancer. Further, simply because Goldberg may not have faced discrimination based on his cancer does not necessarily imply that Team Toyoda did not or could not have discriminated against Kogan for his.

A reasonable jury could conclude from the adduced evidence that Team Toyota's non-discriminatory reason is pretextual.

## IV.    CONCLUSION

For the reasons set forth above, summary judgment will be denied.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

**_____**

**WENDY BEETLESTONE, J.**